Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

ATTORNEY FOR APPELLANT:

**P. STEPHEN MILLER**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

FILED
Jan 25 2012, 9:21 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| ANTHONY EARL COAKLEY, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | )  No. 02A03-1107-CR-358 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Wendy W. Davis, Judge
Cause No. 02D04-1007-FD-709

**January 25, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Anthony Earl Coakley ("Coakley") appeals from his conviction for one count of resisting law enforcement[1] as a Class A misdemeanor. Coakley presents the following restated issues for our review:

I. Whether there was sufficient evidence to support his conviction; and

II. Whether the trial court committed reversible error in the manner in which witnesses were sworn in to testify.

We affirm.

## FACTS AND PROCEDURAL HISTORY

At approximately 3:00 a.m. on June 15, 2010, Lisa Coakley ("Lisa") called 911 to report that she and her husband, Coakley, were having a heated argument and requested that officers be dispatched to her home to calm things down. Fort Wayne Police officers were dispatched to the home on the report of a domestic dispute. The officers arrived at the Coakley residence a short time later.

Officer David McCarran ("Officer McCarran"), the first to arrive on the scene, could hear yelling from inside the home as he approached the front door. He knocked on the front door and then heard the overhead garage door open. Another officer arrived on the scene at approximately the same time as Officer McCarran went to investigate the garage door opening. Lisa came out of the garage, and Officer McCarran spoke with her. Lisa confirmed that she had called 911. Coakley came to the garage doorway "yelling, arguing, [and continuing] to kind of escalate the situation." *Tr.* at 76. While yelling at Lisa, Coakley admitted that he was drunk and refused to leave the house.

---

[1] *See* Ind. Code § 35-44-3-3.

2

The officers attempted to separate the two in an effort to calm down the situation and find a peaceful solution so they would not have to return later. Officer Christopher Felton ("Officer Felton") spoke with Lisa while other officers spoke with Coakley. Lisa told Officer Felton that she was trying to sleep when Coakley arrived home intoxicated. She became angry with Coakley because he began making loud noises, and she had to go to work in a few hours. She attempted to call police officers after Coakley threw a can at her, but Coakley prevented her from doing so at first.

After Coakley refused to come outside, Officer McCarran asked him if the officers could come inside the home to speak with him. Coakley consented to the officers entering his home. Officer McCarran and Officer James Arnold ("Officer Arnold") entered the home and spoke with Coakley, who was cooking food in the kitchen. The officers allowed Coakley to express his frustration. Neither Coakley nor Lisa wanted to leave the home in order to calm the situation, but Lisa was uncomfortable with remaining in the home while Coakley was still there. All of the officers moved to join Lisa in the garage. Coakley came to the garage doorway where he resumed yelling and cursing at Lisa. When the officers attempted to separate the two, Coakley began yelling and cursing at the officers as well.

Officer Arnold walked toward Coakley, with Officer McCarran following behind him, and instructed Coakley to stop yelling and to re-enter the house. Coakley continued yelling and cursing at the officers. Coakley backed toward the kitchen, stopped, and then pointing his finger very close to Officer Arnold's face, loudly told the police to leave his home. While yelling at Officer Arnold, Coakley spat food and saliva on Officer Arnold's glasses and face. Officer Arnold then told Coakley he was placing him under arrest and ordered Coakley to

3

turn around so that he could be handcuffed. When Officer Arnold reached for Coakley's wrist, however, Coakley pulled away from the officer. Officer Arnold then grabbed Coakley's shoulder in an attempt to turn him around, but Coakley bent forward and started to charge both officers. Officer McCarran grabbed Coakley's upper body but began falling backwards down the stairs before he could catch himself. Coakley changed directions and lunged toward the open door to the garage.

Coakley's head went through a glass window, as did Officer McCarran's right arm. Both men were bleeding profusely from their wounds. Coakley, however, continued to refuse to allow the officers to handcuff him. The officers yelled at Coakley to stop resisting, but Coakley continued to try to get up from the ground. Officer Felton then told Coakley that he was going to tase him if he did not stop struggling. Coakley continued to struggle, and Officer Felton tased him two times before he stopped resisting and could be handcuffed.

The officers called for an ambulance to treat Coakley's wounds. Medics treated Coakley on the scene before transporting him to the hospital. While the officers were waiting outside with Coakley, he continued to yell and curse at them and threatened to sue them.

The State charged Coakley with battery by body waste as a Class D felony, resisting law enforcement as a Class A misdemeanor, and interference with the reporting of a crime, as a Class A misdemeanor. The State ultimately dismissed the count alleging interference with the reporting of a crime. At the conclusion of a jury trial, Coakley was acquitted of the count alleging battery by body waste, but was convicted of resisting law enforcement. Coakley now appeals. Additional facts will be added as necessary.

4

## DISCUSSION AND DECISION

### I. Sufficiency of the Evidence

Coakley challenges the sufficiency of the evidence supporting his conviction for resisting law enforcement. When reviewing the sufficiency of the evidence, we consider only the probative evidence and reasonable inferences supporting the verdict. *Mork v. State*, 912 N.E.2d 408, 411 (Ind. Ct. App. 2009). We do not reweigh the evidence or reassess witness credibility. *Id*. We consider conflicting evidence most favorable to the trial court's ruling. *Id*. We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id*.

In order to establish that Coakley had committed the offense of resisting law enforcement as a Class A misdemeanor, the State was required to prove as follows:

> A person who knowingly or intentionally . . . forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties . . . commits resisting law enforcement, a Class A misdemeanor.

Ind. Code § 35-44-3-3-(a)(1). The jury found that the State had met its burden of proof, and we agree.

In *Spangler v. State*, 607 N.E.2d 720, 724 (Ind. 1993), the Supreme Court found that the evidence was not sufficient to support a defendant's conviction of resisting law enforcement absent any evidence of strength, power, or violence or any movement or threatening gesture directed toward the law enforcement official. Later, in *Ajabu v. State*, 704 N.E.2d 494, 495 (Ind. Ct. App. 1998), a panel of this court found that the evidence was insufficient to establish that the defendant acted forcibly, where the defendant did nothing

5

more than stand his ground. In *Ajabu*, the evidence of resistance was the defendant's refusal to release a flag to the police officer, twisting and turning a little as he held on to the flag. *Id.* at 496.

In *Guthrie v. State*, 720 N.E.2d 7, 9 (Ind. Ct. App. 1999), *trans. denied* (2000), a panel of this court disagreed with Guthrie's argument that he passively resisted arrest and found that sufficient evidence existed to sustain his conviction for forcibly resisting arrest. There, Guthrie was arrested and transported to lockup where he refused to exit the vehicle, and refused to stand after he was physically removed from the vehicle. Guthrie leaned back and kept his legs straight, forcing the officers to carry him to the receiving area. We held that Guthrie applied some force, which required the officers to exert force to counteract Guthrie's acts of resistance. *Id.* at 8. Likewise, in *Johnson v. State*, 833 N.E.2d 516, 518-19 (Ind. Ct. App. 2005), this court affirmed the defendant's conviction based on the defendant's acts of turning and pushing away from the officers and stiffening up when the officers attempted to place him into a transport vehicle. In *Johnson*, this court acknowledged that the definition of "forcibly resist" as defined in *Spangler,* was "moderated," or relaxed. *Id.* at 519.

*Spangler* seems to require some threatening gesture or movement toward the law enforcement officer, yet later cases have relaxed the definition of "forcibly." *See Johnson*, 833 N.E.2d at 519; *Guthrie*, 720 N.E.2d at 9. Those later cases have, instead, required the exertion of force by the law enforcement officer in response to the defendant's acts in resistance, and in order to compel the arrestee's compliance with being handcuffed. Furthermore, this court has held that Indiana Code section 35-44-3-3 does not demand an overly strict definition of "forcibly resist." *See Johnson*, 833 N.E.2d at 519.

6

Here, the evidence cited above clearly is sufficient to support Coakley's conviction. Coakley yelled at, argued with, and spat on Officer Arnold, who was at the residence to calm down the domestic dispute. Officer Arnold told Coakley that he was placing him under arrest and ordered Coakley to turn around so that he could be handcuffed. When Officer Arnold reached for Coakley's wrist, however, Coakley pulled away from the officer. Officer Arnold then grabbed Coakley's shoulder in an attempt to turn him around, but Coakley bent forward and started to charge both officers. Officer McCarran grabbed Coakley's upper body, but began falling backwards down the stairs before he could catch himself. Coakley changed directions and lunged toward the open door to the garage.

Coakley's head went through a glass window, as did Officer McCarran's right arm. As a result of this, Coakley was bleeding profusely from a wound to his head, and Officer McCarran was bleeding from the wounds to his arm. Coakley, however, continued to refuse to allow the officers to handcuff him. The officers yelled at Coakley to stop resisting, but Coakley continued to try to get up off the ground. Officer Felton then told Coakley that he was going to tase him if he did not stop struggling. Coakley continued to struggle, and Officer Felton tased him two times before he stopped resisting and could be handcuffed.

Coakley argues that the evidence at trial showed that he pulled his hand back and away from Officer Arnold's face after being told that he was being placed under arrest. He characterizes that behavior as compliant instead of non-compliant. He then contends that any other lunging action or action that led to Officer McCarran's arm and Coakley's head going through the glass pane in the window was the result of Coakley's involuntary reaction from being tased. This, however, is merely a request for us to reweigh the evidence, a task we will

7

not do. *See Mork*, 912 N.E.2d at 411. We conclude that the evidence, viewed consistently with our standard of review, was sufficient to support the conviction.

## II. Oath

Coakley argues that he was denied his right to a fair jury trial and the right to confront witnesses against him because of a defect in the manner in which the witnesses were sworn in by the trial court. In particular, Coakley asserts that the trial court erred by failing to ask each witness whether he or she preferred to "affirm" rather than "swear" to tell the truth.

The record reveals that the trial court gave the following oath to each witness:

> Do you solemnly swear the testimony you're about to give will be the truth, the whole truth and nothing but the truth, so help you God?

*Supp. Tr*. at 3-5.

The State correctly notes that Coakley failed to object to the manner in which the witnesses were sworn during trial. The failure to object to an alleged error at trial results in waiver of the issue on appeal. *Mitchell v. State*, 726 N.E.2d 1228, 1235 (Ind. 2000). Therefore, this issue has been waived for purposes of appellate review on that ground. However, a defendant can escape waiver of an issue for failure to object if the claimed error is fundamental error. *Charlton v. State*, 702 N.E.2d 1045, 1051 (Ind. 1998). In this case, Coakley claims that the error is structural error that compels reversal of his conviction as it defies harmless error analysis, and cites to both the Sixth Amendment to the United States Constitution and Article I, section 13 of the Indiana.

"The 'fundamental error' exception is extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is

8

substantial, and the resulting error denied the defendant fundamental due process." *Mathews v. State*, 849 N.E.2d 578, 587 (Ind. 2006). The Indiana Constitution provides that "[t]he mode of administering an oath or affirmation, shall be such as may be most consistent with, and binding upon, the conscience of the person, to whom such oath or affirmation may be administered." Ind. Const. art. I § 8.

Further, the Indiana Rules of Evidence provide as follows:

Before testifying, every witness shall swear or affirm to testify to the truth, the whole truth, and nothing but the truth. The mode of administering an oath or affirmation shall be such as is most consistent with, and binding upon the conscience of the person to whom the oath is administered.

Ind. Evidence Rule 603. The provision in the Federal Rules of Evidence is similar in content. *See* Fed. R. Evid. 603 ("Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so.").

Coakley acknowledges the holding of *United States v. Babul*, 476 F.3d 498, 500-01 (7th Cir. 2007), that defense counsel may waive the requirement that testimony be taken under oath. However, Coakley argues that defense counsel may not waive that requirement as to every witness. We note that such is not the case here, where each witness received an oath, unlike in *Babul*, where one witness did not receive an oath prior to testifying. We thus disagree with Coakley's characterization that he was denied of his right to confront witnesses against him, as all testimonial evidence in this case was presented under oath. What was waived here was the challenge to the form of the oath administered. Coakley has failed to

9

demonstrate how the form of the oath administered by the trial court constituted fundamental error.  Thus, the issue is waived.

Affirmed.

BARNES, J., and BRADFORD, J., concur.